# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 10, 2014                    Decided July 11, 2014

No. 12-5310

NATIONAL MINING ASSOCIATION, ET AL.,
APPELLEES

v.

GINA MCCARTHY, SUED IN HER OFFICIAL CAPACITY,
ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION
AGENCY, ET AL.,
APPELLANTS

HAZARD COAL CORPORATION, ET AL.,
APPELLEES

———

Consolidated with 12-5311

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01220)

———

*Matthew Littleton*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Robert G. Dreher*, Acting Assistant Attorney General, *Aaron P. Avila*, *Michael T. Gray*, *Cynthia J. Morris*, *Kenneth C.*

*Amaditz*, Attorneys, and *Ann D. Navaro*, Attorney, Office of the Chief Counsel United States Army Corps of Engineers.

*Emma C. Cheuse* argued the cause for appellants Sierra Club, et al. With her on the briefs were *Jennifer C. Chavez* and *Derek O. Teaney*.

*Kirsten L. Nathanson* argued the cause for appellees National Mining Association and Kentucky Coal Association. With her on the brief were *John C. Martin*, *David Y. Chung*, *Mindy G. Barfield*, and *Sadhna G. True*.

*Benjamin L. Bailey* argued the cause for appellees State of West Virginia, et al. *Mary Stephens* argued the cause for appellee Commonwealth of Kentucky. With them on the brief were *Michael B. Hissam*, *Patrick Morrissey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Elbert Lin*, Solicitor General, *Mindy G. Barfield*, and *Sadhna G. True*.

*Luther J. Strange III*, Attorney General, Office of the Attorney General of the State of Alabama, *John C. Neiman Jr.*, Solicitor General, *Andrew L. Brasher*, Deputy Solicitor General, *Jon C. Bruning*, Attorney General, Office of the Attorney General for the State of Nebraska, *Mike Dewine*, Atorney General, Office of the Attorney General for the State of Ohio, *Scott Pruitt*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Ken Cuccinelli*, Attorney General at the time the brief was filed, Office of the Attorney General for the Commonwealth of Virginia, *Michael C. Geraghty*, Attorney General, Office of the Attorney General for the State of Alaska, *Pamela Jo Bondi*, Attorney General, Office of the Attorney General for the State of Florida, *Derek Schmidt*,

Attorney General, Office of the Attorney General for the State of Kansas, *Bill Schuette*, Attorney General, Office of the Attorney General for the State of Michigan, and *Timothy C. Fox*, Attorney General, Office of the Attorney General for the State of Montana, were on the brief for *amici curiae* States of Alabama, et al. in support of appellees.

*Karma B. Brown, Peter C. Tolsdorf, M. Reed Hopper, Ellen Steen, Thomas Ward, Quentin Riegel, Kristy A.N. Bulleit*, and *Andrew J. Turner* were on the brief for *amici curiae* American Farm Bureau Federation, et al. in support of appellees.

Before: GRIFFITH, KAVANAUGH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The process of surface coal mining is straightforward. When a coal deposit lies close to the earth's surface, mining companies remove the topsoil and the rock above the coal. Once the coal is exposed, the companies extract it and relocate the removed earth.

Surface coal mining in the Appalachian region produces a good deal of America's domestic coal, which is an important source (along with natural gas and nuclear energy) for the electricity that lights American houses and businesses, and powers TVs and computers in American homes. But surface coal mining also leaves its mark on the environment. Among other effects, the process changes the nature of the land where the mining takes place, causing erosion and landslides.

In the 1972 Clean Water Act and the 1977 Surface Mining Control and Reclamation Act, Congress struck a balance between the need for coal on the one hand and the desire to mitigate surface coal mining's environmental effects on the other. Congress created an extensive permitting system for surface coal mining projects. To conduct a coal mining project, a business must obtain permits from the Department of Interior or a federally approved state permitting program. If the mining project would result in the discharge of soil or other pollutants into navigable waters, the mining project also requires two Clean Water Act permits. The first Clean Water Act permit (known as the Section 404 permit) must be obtained from the U.S. Army Corps of Engineers. The Army Corps of Engineers permitting process also involves EPA, as EPA can deny the use of the sites selected as disposal sites for dredged or fill material. The second Clean Water Act permit (known as the Section 402 or NPDES permit) is issued by EPA or, as relevant here, EPA-approved state permitting authorities. The state permitting process likewise involves EPA, as States must submit a proposed permit to EPA for review, and EPA may object if the permit in EPA's view does not meet extant state water quality standards or other provisions of the Clean Water Act.

In June 2009, the Army Corps of Engineers and EPA adopted an Enhanced Coordination Process to facilitate their consideration of certain Clean Water Act permits. The Enhanced Coordination Process allows EPA to screen Section 404 mining permit applications submitted to the Corps. EPA then initiates discussions with the Corps on proposed mining projects that EPA considers likely to damage water bodies.

In 2011, EPA also promulgated a Final Guidance document relating to those Clean Water Act permits. Among other things, the Final Guidance recommends that States

impose more stringent conditions for issuing permits under Section 402.

The States of West Virginia and later Kentucky, along with coal mining companies and trade associations – whom we will collectively refer to as plaintiffs – challenged the Enhanced Coordination Process and EPA's Final Guidance before the district court as exceeding EPA's authority under the Surface Mining Control and Reclamation Act and the Clean Water Act. The District Court agreed and granted summary judgment for plaintiffs. We conclude otherwise. In our view, EPA and the Corps acted within their statutory authority when they adopted the Enhanced Coordination Process. And under our precedents, the Final Guidance is not a final agency action reviewable by the courts at this time. If and when an applicant is denied a permit, the applicant at that time may challenge the denial of the permit as unlawful.

We therefore reverse the District Court's grant of summary judgment to plaintiffs. We remand to the District Court with directions to grant judgment for the Government on the Enhanced Coordination Process claim and to dismiss plaintiffs' challenge to the Final Guidance.

I

The two statutes at issue in this case together regulate surface coal mining. Under the Surface Mining Control and Reclamation Act of 1977, mining projects require permits to ensure that the planned projects will sufficiently protect the environment. *See* 30 U.S.C. § 1256. The Department of the Interior's Office of Surface Mining Reclamation and Enforcement oversees Department of Interior-approved state programs for issuing those permits. *See id.* §§ 1211, 1251-56. Those permits are not at issue in this case.

Under the Clean Water Act, mining projects that result in the discharge of soil or other pollutants into navigable waters must meet additional requirements. *See* 33 U.S.C. § 1311(a). As relevant here, those mining projects must comply with state "water quality standards." *See id.* § 1311(b)(1)(C). State water quality standards identify the proper uses of water bodies (recreation, irrigation, etc.) and provide "water quality criteria" to measure the health of those water bodies. An example of water quality criteria is a requirement that "no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." W. VA. CODE R. § 47-2-3.2.i. Under the Clean Water Act, a mining project may not violate the relevant state water quality standards. *See* 33 U.S.C. § 1342(b)(1)(A); 40 C.F.R. § 122.44(d)(1).

To ensure that no violation occurs, those mining projects that result in the discharge of soil and other pollutants into navigable waters require two Clean Water Act permits.

The first is a permit under Section 404 of the Act. *See* 33 U.S.C. § 1344. Section 404 permits ensure that the discharge of dredged or fill material as a result of the mining project will not harm navigable waters. As relevant here, the Army Corps of Engineers issues those permits, but EPA plays a role because EPA may deny the use of an area as a disposal site if a discharge at that site would "have an unacceptable adverse effect" on certain water bodies, wildlife, or recreational areas. *Id.* § 1344(c); *see Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 612-13 (D.C. Cir. 2013). So the Corps and EPA have complementary roles in the Section 404 process.

The second is a permit under Section 402 of the Act. *See* 33 U.S.C. § 1342. Section 402 permits – known also as National Pollutant Discharge Elimination System or NPDES

permits – ensure that mining projects do not result in any other pollutants damaging States' water bodies. As relevant here, States decide whether to issue those permits, but EPA may object to issuance of the permit if EPA concludes that the permit would not meet state water quality standards or other requirements of the Clean Water Act. *See id.* § 1342(d). So States and EPA both have a role in Section 402 permits.

In 2009, the two federal agencies involved in Section 404 permits, EPA and the Army Corps of Engineers, signed an "Enhanced Coordination Process" memorandum. The Enhanced Coordination Process applies to 108 permit applications that were stalled in the Section 404 permitting process because of litigation. The Enhanced Coordination Process calls for EPA to run the applications through a database that compares the information in the permit application to the guidelines the Corps must consider when issuing permits. (The guidelines identify, among other things, mining practices that may damage the environment.) Using the Enhanced Coordination Process, EPA identifies permits that could run afoul of the guidelines and notifies the Corps. Over a 60-day period, subject to extensions, EPA and the Corps, along with any interested parties, then discuss those permit applications. The Corps then decides whether to issue the permits.

In 2011, EPA also issued a Final Guidance document related to, among other things, Section 402 permits. The Final Guidance explained that recent peer-reviewed studies had found that surface coal mining raises the salinity of States' waters. That elevated salinity increases the ability of the water bodies to conduct electricity – that is, it increases their conductivity. According to the studies, certain levels of conductivity endanger aquatic life. The Final Guidance therefore advises EPA staff to ask state permitting authorities

to assess the potential for elevated conductivity in proposed Section 402 permits. For the Appalachian region, the Final Guidance recommends that water conductivity levels not exceed 300-500 μS/cm (microSiemens per centimeter).

The States of West Virginia and later Kentucky, along with coal mining companies and trade associations, brought a variety of challenges in federal district court. Collectively, the lawsuits challenged both the Enhanced Coordination Process and the Final Guidance document. Arrayed against those plaintiffs were EPA, the Army Corps of Engineers, and several intervenor environmental organizations.

First, plaintiffs argued that the Enhanced Coordination Process violates the Clean Water Act. They also contended that the Enhanced Coordination Process is a legislative rule and therefore should not have been promulgated without notice and comment under the Administrative Procedure Act. Second, they argued that the Final Guidance violates the Clean Water Act and the Surface Mining Control and Reclamation Act. In a series of rulings, the District Court granted summary judgment to plaintiffs. The rulings invalidated the Enhanced Coordination Process and the Final Guidance. We review the District Court's grant of summary judgment de novo.

II

We first address plaintiffs' challenges to the Enhanced Coordination Process adopted by EPA and the Army Corps of Engineers for coordination on Section 404 permits.

A

Plaintiffs argue that the Enhanced Coordination Process violates the Clean Water Act. In particular, relying on a form

of the expressio unius canon, plaintiffs point out that Congress has explicitly mandated EPA participation at certain stages of the Section 404 permitting process: for example, to co-write guidelines under Section 404(b), to veto one aspect of a permit under Section 404(c), to minimize delays under Section 404(q), and to exempt certain discharges from the permitting process under Section 404(*l*). *See* 33 U.S.C. § 1344(b), (c), (q), (*l*). Those explicit grants of statutory authority to EPA in the Section 404 process, according to plaintiffs, mean that Congress silently intended to restrict EPA's involvement in the Corps' permitting process outside of those four circumstances.

We reject that argument. To begin with, nothing in the Enhanced Coordination Process has changed the statutory criteria on which the Section 404 permitting decisions are based. And nothing in the Enhanced Coordination Process has changed the substantive statutory responsibilities of the two agencies involved in the Section 404 permitting process. The Corps still makes the ultimate decision whether to approve the permit. EPA still makes the decisions on the disposal sites. So plaintiffs' objection here is simply to enhanced consultation and coordination between two federal agencies. But no statutory provision forbids EPA from consulting with or coordinating with the Corps, or vice versa.

And we will not read into that statutory silence an implicit ban on inter-agency consultation and coordination. After all, this kind of inter-agency consultation and coordination is commonplace and often desirable. Indeed, restricting such consultation and coordination would raise significant constitutional concerns. Under Article II of the Constitution, departments and agencies in the Executive Branch are subordinate to one President and may consult and coordinate to implement the laws passed by Congress. *See*

U.S. CONST. art. II, § 1, cl. 1 (Executive Power Clause); U.S. CONST. art. II, § 3 (Take Care Clause). The two agencies here are both executive agencies that operate under the direction and supervision of the single President. Putting aside independent agencies, none of which is involved here, the one President is responsible and accountable for the entirety of the Executive Branch. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138, 3152-56 (2010). Indeed, one of the main goals of any President, and his or her White House staff, is to ensure that such consultation and coordination occurs in the many disparate and far-flung parts of the Executive behemoth. The right hand should know what the left hand is doing. Given the backdrop of Executive Branch tradition, sound government practice, and constitutional principle, we will not, as plaintiffs request, read into this statute an *implicit* congressional intent to restrict consultation and coordination between two executive agencies. As this Court, in an opinion by Judge Wald, once stated when considering consultations among Executive Branch officers, our "form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive. Single mission agencies do not always have the answers to complex regulatory problems" and need "to know the arguments and ideas of policymakers in other agencies as well as in the White House." *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). Put another way: In a "single Executive Branch headed by one President," we do not lightly impose a rule "that would deter one executive agency from consulting another about matters of shared concern." *Empresa Cubana Exportadora de Alimentos y Productos Varios v. Department of the Treasury*, 638 F.3d 794, 803 (D.C. Cir. 2011). So it is here.

In short, the Clean Water Act does not explicitly or implicitly bar the Enhanced Coordination Process adopted by the Army Corps of Engineers and EPA.[1]

B

Plaintiffs argue, however, that the memorandum initiating the Enhanced Coordination Process is a legislative rule that was promulgated without the required notice and comment. Legislative rules have the "force and effect of law" and may be promulgated only after public notice and comment. *INS v. Chadha*, 462 U.S. 919, 986 n. 19 (1983) (internal quotation marks omitted). But the APA does not require notice and comment for interpretive rules, general

---

[1] Plaintiffs also argue that the Enhanced Coordination Process is incompatible with the Corps' regulations for processing Section 404 permit applications. Those regulations state that Corps engineers "will be guided by" certain time limits in evaluating permit applications, including a target that "engineers will decide on all applications not later than 60 days after receipt of a complete application" unless one of six exceptions applies. 33 C.F.R. § 325.2(d)(3). It is true that the memorandum initiating the Enhanced Coordination Process indicates that the process may take more than 60 days to complete. However, one of the six exceptions to the 60-day target applies when "[i]nformation needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period." *Id.* § 325.2(d)(3)(vi). The Corps tells us that its engineers may need more than 60 days to determine, in conjunction with EPA, that surface mining will not degrade waterways covered by the Clean Water Act. In any event, the Corps' regulations are aspirational time targets rather than mandatory requirements. *See* 47 Fed. Reg. 31,794, 31,796 (July 22, 1982) (time targets in Section 325.2(d)(3) are "goals"); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency's interpretation of own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'").

statements of policy, and rules of organization, procedure, or practice. *See* 5 U.S.C. § 553(b)(3)(A).

We need not dally on this issue. The "critical feature" of a procedural rule "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *James V. Hurson Associates, Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (internal quotation marks omitted). That description neatly covers the Enhanced Coordination Process. The Enhanced Coordination Process is a rule of procedure and thus did not require notice and comment.

III

Plaintiffs also challenge the Final Guidance. They contend that the Final Guidance exceeds EPA's authority under the Clean Water Act and the Surface Mining Control and Reclamation Act. According to plaintiffs, the Final Guidance's instruction to EPA staff to recommend limitations on mining projects – including that mining projects meet the conductivity levels identified in scientific studies – impermissibly interjects extra-statutory roadblocks into States' Section 402 permitting process.

We may review agency action under the APA only if it is "final." 5 U.S.C. § 704. One might think that an agency memo entitled "Final Guidance" would be final. But that would be wrong, at least under the sometimes-byzantine case law. An agency action is final only if it is *both* "the consummation of the agency's decisionmaking process" *and* a decision by which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). EPA concedes that the Final

Guidance is the consummation of EPA's decisionmaking process. But EPA characterizes the Final Guidance as a general policy statement that has no "legal consequences." Therefore, according to EPA, we cannot review its legality at this time; EPA says that judicial review must wait until a permit applicant has had a permit denied and seeks review of that permit denial.

To analyze EPA's reviewability argument, we need to take a step back. The APA divides agency action, as relevant here, into three boxes: legislative rules, interpretive rules, and general statements of policy. A lot can turn on which box an agency action falls into. In terms of reviewability, legislative rules and sometimes even interpretive rules may be subject to pre-enforcement judicial review, but general statements of policy are not. *See, e.g., Whitman v. American Trucking Associations*, 531 U.S. 457, 477-49 (2001) (reviewable interpretive rule); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149-51 (1967) (reviewable legislative rule); *National Park Hospitality Association v. Department of the Interior*, 538 U.S. 803, 809-11 (2003) (non-reviewable policy statement). Legislative rules generally require notice and comment, but interpretive rules and general statements of policy do not. *See* 5 U.S.C. § 553. Legislative rules generally receive *Chevron* deference, but interpretive rules and general statements of policy often do not. *See United States v. Mead Corp.*, 533 U.S. 218 (2001); *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984).

So given all of that, we need to know how to classify an agency action as a legislative rule, interpretive rule, or general statement of policy. That inquiry turns out to be quite difficult and confused. It should not be that way. Rather, given all of the consequences that flow, all relevant parties should instantly be able to tell whether an agency action is a

legislative rule, an interpretive rule, or a general statement of policy – and thus immediately know the procedural and substantive requirements and consequences. An important continuing project for the Executive Branch, the courts, the administrative law bar, and the legal academy – and perhaps for Congress – will be to get the law into such a place of clarity and predictability. *See generally* John F. Manning, *Nonlegislative Rules*, 72 GEO. WASH. L. REV. 893, 893 (2004) ("Among the many complexities that trouble administrative law, few rank with that of sorting valid from invalid uses of so-called 'nonlegislative rules.'").

For today, however, our far more modest task is to apply existing precedents on reviewability to EPA's Final Guidance. Under the case law, legislative rules (and sometimes interpretive rules) may be subject to pre-enforcement review. Plaintiffs contend that the Final Guidance is a legislative rule and thus subject to pre-enforcement review now. But in EPA's view, the Final Guidance is a general statement of policy, which means it is not subject to pre-enforcement review. As the parties frame it, the reviewability issue turns on one question: Is the Final Guidance a legislative rule or a general statement of policy?

To answer that question, we must know what makes something a legislative rule or general statement of policy. To simplify a bit, we offer the following overview: An agency action that purports to impose legally binding obligations or prohibitions on regulated parties – and that would be the basis for an enforcement action for violations of those obligations or requirements – is a legislative rule. An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule. (As to interpretive rules, an agency action that merely interprets a prior statute or regulation, and does not itself

purport to impose new obligations or prohibitions or requirements on regulated parties, is an interpretive rule.) An agency action that merely explains how the agency will enforce a statute or regulation – in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule – is a general statement of policy.

But those general descriptions do not describe tidy categories and are often of little help in particular cases. So in distinguishing legislative rules from general statements of policy, our cases have focused on several factors.

The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities. *See Catawba County v. EPA*, 571 F.3d 20, 33-34 (D.C. Cir. 2009); *General Electric Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002); *see also National Association of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005). Here, that factor favors EPA. As a legal matter, the Final Guidance is meaningless. As EPA acknowledged at oral argument, "The Guidance has no legal impact." Oral Arg. at 12:12. The Final Guidance does not tell regulated parties what they must do or may not do in order to avoid liability. The Final Guidance imposes no obligations or prohibitions on regulated entities. State permitting authorities "are free to ignore it." *Id.* at 12:19. The Final Guidance may not be the basis for an enforcement action against a regulated entity. Moreover, the Final Guidance may not be relied on by EPA as a defense in a proceeding challenging the denial of a permit. And the Final Guidance does not impose any requirements in order to obtain a permit or license. As a matter of law, state permitting authorities and permit applicants may ignore EPA's Final Guidance without facing any legal consequences. *Cf. Holistic Candlers & Consumers Association v. FDA*, 664 F.3d 940,

944 (D.C. Cir. 2012) (FDA warning letter not final agency action because it "communicates the agency's position on a matter" but "compels action by neither the recipient nor the agency") (internal quotation marks omitted).

Another factor in our case law concerns the agency's characterization of the guidance. *See Center for Auto Safety v. National Highway Traffic Safety Administration*, 452 F.3d 798, 806 (D.C. Cir. 2006); *General Electric*, 290 F.3d at 382. The Final Guidance repeatedly states that it "does not impose legally binding requirements." J.A. 1052; *see also id.* at 1054, 1080. The Final Guidance also notes that it is "not intended to direct the activities of any other Federal, State or local agency or to limit the exercise of their legal authority." *Id.* at 1053. On its face, the Final Guidance disclaims any intent to require anyone to do anything or to prohibit anyone from doing anything. To be sure, the Final Guidance may signal likely future permit denials by EPA; if so, those permit denials can be challenged at that time, and EPA will not be able to rely on the Final Guidance in defending a permit denial.

Plaintiffs counter that this Court has referred to similar agency caveats in guidance documents as "boilerplate." *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). In *Appalachian Power*, this Court found that an EPA guidance document was a legislative rule despite the guidance document's caveat denying its compulsory nature. *See id.* But in doing so, we examined the document as a whole and noted that "the entire Guidance, from beginning to end – except the last paragraph – reads like a ukase. It commands, it requires, it orders, it dictates." *Id.* Here, the caveats run throughout the document, and more to the point, the document is devoid of relevant commands. *See, e.g.*, J.A. 1080 (Final Guidance is "not legally or practically binding on

the Corps' determinations of whether a particular project complies" with Section 404(b)(1) guidelines).

Our cases also have looked to post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties. In many cases, of course, we will not yet know the answer to that question because the recently issued guidance will have been implemented in only a few instances. So we will get only an early snapshot. In any event, in this case, the sparse record before us does not suggest that the agency has applied the Final Guidance as if it were binding on regulated parties.

Plaintiffs nonetheless point to EPA's statutory role within the permitting programs and argue that permit applicants (and state permitting authorities) really have no choice when faced with EPA "recommendations" except to fold. As plaintiffs see it, EPA will not issue the permit unless its recommendations are followed. But while regulated parties may feel pressure to voluntarily conform their behavior because the writing is on the wall about what will be needed to obtain a permit, there has been no "order compelling the regulated entity to do anything." *Independent Equipment Dealers Association v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (internal quotation marks and alteration omitted). States and permit applicants may ignore the Final Guidance without suffering any legal penalties or disabilities, *see* Oral Arg. at 40:16, and permit applicants ultimately may be able to obtain permits even if they do not meet the recommendations in the Final Guidance. And EPA agrees that the Final Guidance "has no legal impact" and that state permitting authorities are "free to ignore it." *Id.* at 12:12.

To be clear, we reiterate what we have said before: "When the agency applies [a general statement of] policy in a

particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C. Cir. 1974).

We have considered all of plaintiffs' arguments for obtaining review now of the Final Guidance and find them unpersuasive under the current case law. The question is not whether judicial review will be available but rather whether judicial review is available *now*. The Final Guidance is not a final agency action subject to pre-enforcement review. We therefore do not decide plaintiffs' challenges to the legality of the Final Guidance at this time.

* * *

We conclude that the Enhanced Coordination Process memorandum is a procedural rule that EPA and the Corps had authority to enact under the Clean Water Act. Under our case law, we conclude that the Final Guidance is not a final agency action subject to review at this time. We therefore reverse the District Court's grant of summary judgment and remand to the District Court with instructions to grant judgment for defendants on the Enhanced Coordination Process and to dismiss the challenge to the Final Guidance.

*So ordered.*