# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 20, 2017    Decided August 4, 2017

No. 16-1209

UNITED SOURCE ONE, INC.,
PETITIONER

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
FOOD SAFETY AND INSPECTION SERVICE, ET AL.,
RESPONDENTS

On Petition for Review from a Decision of the
Food Safety and Inspection Service
of the United States Department of Agriculture

*Paul H. Gardner* argued the cause for the petitioner. *Andrew H. Baida* and *David M. Wyand* were with him on brief.

*Joseph F. Busa*, Attorney, United States Department of Justice, argued the cause for the respondents. *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General at the time the brief was filed, and *Mark B. Stern*, Attorney, were with him on brief.

Before: HENDERSON and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

KAREN LECRAFT HENDERSON, *Circuit Judge*:

Under the Federal Meat Inspection Act of 1907 ("FMIA"), 21 U.S.C. §§ 601 *et seq.*, and implementing regulations, the Food Safety and Inspection Service ("FSIS"), an agency of the United States Department of Agriculture ("USDA"), is charged with ensuring, *inter alia*, that certain commercial meat products are not misbranded. If the FSIS determines that a meat product's labeling is "false or misleading in any particular," 21 U.S.C. § 607(e), it can prohibit its use. Pursuant to that authority, the FSIS determined that the packaging used by United Source One, Inc. ("US1"), a meat exporter, was misbranded because its label included the FSIS inspection identification number of its supplier without the latter's permission. For the reasons that follow, we deny US1's petition for review.

## I. BACKGROUND

### *Regulatory Landscape*

The Congress enacted the FMIA to protect "the health and welfare of consumers . . . by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 602. To that end, the FMIA mandates inspection of certain commercial meat products as well as the facilities—referred to as "official establishments"[1]—where those products are

---

[1] An "official establishment" is "[a]ny slaughtering, cutting, boning, meat canning, curing, smoking, salting, packing, rendering,

handled. *Id.* § 608. By regulation, the FSIS carries out that mandate. 9 C.F.R. § 300.2(b)(1). "[D]ay or night," FSIS inspectors have access to an official establishment to ensure that it operates in sanitary conditions and that its meat is not "adulterated." 21 U.S.C. § 606(a). Commercial meat products that meet the FMIA's standards are marked as "[i]nspected and passed." *Id.* At 9 C.F.R. § 312.2, the following example of an "official mark" of inspection appears:



---

or similar establishment at which inspection is maintained under" the FMIA implementing regulations. 9 C.F.R. § 301.2. As explained *infra*, US1 does not fit the "official establishment" description—US1 is a re-boxing facility that, at its option, is subject to FSIS inspection under the Agricultural Marketing Act of 1946, 7 U.S.C. §§ 1621 *et seq.*, not the FMIA. But it, like an official establishment, is subject to the misbranding/mislabeling prohibitions of the FMIA. 21 U.S.C. § 610 ("No person, firm, or corporation shall, with respect to . . . meat or meat food products . . . do . . . any act while they are being transported in commerce or held for sale after such transportation, which is intended to cause or has the effect of causing such articles to be . . . misbranded.").

Each FSIS inspection mark includes a unique establishment number[2] that identifies the product as having been "prepared" in the facility to which the establishment number belongs. 9 C.F.R. § 305.1(a) ("An official number shall be assigned to each establishment granted inspection . . . [and] shall be used to identify all inspected and passed products prepared in the establishment."). An authorized FSIS inspection mark ordinarily must appear both on the "immediate container" of a commercial meat product, for example, vacuum packaging, *id.* § 317.1, and on any external container, for example, a shipping box, *see id.* § 316.13.

Ordinarily, an official establishment does not ship its products directly to the end-use consumer. Instead, an official establishment ships meat to a "re-boxing" facility, a middleman operation that repackages and resells meat, often under a different brand name. Because the re-boxer itself does not slaughter meat, it is not subject to the FMIA's *mandatory*

---

[2] FSIS Directive 5220.2 provides additional guidance on the "issuance of traditional establishment numbers," which are "used in the official mark of inspection and may be used in labels." FSIS Directive 5220.2, Meat and Poultry Establishment Numbering Procedures (U.S.D.A. 1992). A traditional establishment number "begins with the single code letter that designates the type(s) of inspection performed at the establishment." *Id.* For example, "P" indicates that poultry inspections are conducted at the establishment; "E" indicates equine inspections; "I," import inspections; and "A," animal food inspections. *Id.* "M" indicates meat inspections but, in most instances, including here, it is not included in an establishment number, presumably because meat inspections are so constant. *Id.* ("[A]ny establishment number in the traditional format which does NOT begin with a single letter code is designating red meat inspection."). Following the code letter (assuming one is required), the "next 5 positions are numeric digits, but leading zeros are not shown." *Id.*

inspection requirements. *See* 21 U.S.C. § 608 ("The Secretary shall cause to be made . . . such inspection of all . . . establishments in which amenable species are slaughtered and the meat and meat food products thereof are prepared for commerce . . . ."). Nonetheless, the Agricultural Marketing Act of 1946 ("AMA"), 7 U.S.C. §§ 1621 *et seq.*, and implementing regulations provide that a re-boxing facility may voluntarily pay for and obtain FSIS identification services.[3] *See* 9 C.F.R. § 350.3. FSIS Directive 12,600.1, adopted pursuant to the AMA, provides guidance on the implementation/enforcement of those services. *See* FSIS Directive 12,600.1, Voluntary Reimbursable Inspection Services (U.S.D.A. 2007) (hereinafter "Directive 12,600.1"). Once the re-boxer participates, the FSIS inspection works, *inter alia*, to "ensure that the identity of federally-inspected and passed meat . . . is maintained throughout the division of such meat . . . into smaller portions, its combination into larger units, or its repackaging and relabeling." *Id.* at 3. If the FSIS "determine[s] that the identity [of the repackaged meat] has been maintained," that is, the meat has not been adulterated once it has passed its official establishment inspection, the FSIS "mark[s] such portions or units [of the repackaged meat] with the marks of Federal inspection." 9 C.F.R. § 350.3(a)(1).

As with an official establishment, the FSIS assigns each re-boxing facility its own, unique establishment number that is included as part of the inspection mark on the re-boxer's label. *See* Directive 12,600.1 at 6 ("If the [re-boxing] facility meets the requirements for the requested service(s), the [FSIS] will request the next available [establishment] number through the Resource Information System . . . [and] assign the number to the facility . . . ."). Unlike an *official establishment's*

---

[3] A re-boxer voluntarily participates in the FSIS inspection program so that it can label the meat products it ships as USDA inspected and approved. JA 52.

establishment number, however, which begins with "P" or "M," etc., to designate that it is subject to poultry or meat inspections, respectively, *see supra* 4 n.2, a re-boxer's establishment number begins with "V" to indicate that the FSIS inspection conducted there is pursuant to the AMA inspection regime. *See* FOOD SAFETY INSPECTION SERV., FSIS MEAT, POULTRY AND EGG PRODUCT INSPECTION DIRECTORY LEGEND FOR ESTABLISHMENT NUMBERS AND DIRECTORY SEARCH GUIDANCE 1 (2017); *accord* JA 15, 69-70 (indicating US1's establishment number is "V21467"). Nevertheless, FSIS Directive 12,600.1 provides that a re-boxer may use its supplier's establishment number on its label *if* certain conditions are met:

> Whenever labeling with the originating official establishment number is used by [a re-boxing] facility (i.e., labeling depicting the official number of the establishment that produced the product), inspection program personnel will verify that the [re-boxing] facility code marks the product in a manner that will clearly indicate that the product was last handled and labeled at the [re-boxing] facility. The [re-boxing] facility must maintain records of label transfers and records of products labeled or relabeled at the facility to identify properly the product origin in the event of a product control problem, (e.g., voluntary product recall).

Directive 12,600.1 at 8-9.

Although the FMIA focuses on ensuring the quality of meat products, it also prohibits—as noted earlier—misleading and/or misbranded labeling. To wit, the FMIA prohibits both an official establishment and a re-boxing facility from "do[ing] . . . any act . . . which is intended to cause or has the effect of

causing [meat] to be . . . misbranded." 21 U.S.C. § 610(d). Meat is misbranded "*if its labeling is false* or misleading in any particular." *Id.* § 601(n)(1) (emphasis added). 9 C.F.R. § 317.8(a) likewise provides that "[n]o product or any of its . . . packaging . . . shall bear any false or misleading marking, label, or other labeling and no statement, word, picture, design, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling." The misbranding prohibition includes the FSIS official mark of inspection. 21 U.S.C. § 601(p) ("The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.").

If the FSIS determines that labeling is false or misleading, thereby rendering a meat product "misbranded," *id.* § 601(n)(1), it may direct that the labeling "be withheld" from use, *id.* § 607(e) ("If the [FSIS] has reason to believe that any marking or labeling . . . is false or misleading in any particular, [it] may direct that such use be withheld . . . ."). Once the FSIS determination becomes final, an aggrieved party may petition for review within thirty days thereafter. *Id.* ("Any such determination by the Secretary shall be conclusive unless, within thirty days after receipt of notice of such final determination, the person, firm, or corporation adversely affected thereby appeals to the United States court of appeals . . . .").

*Factual and Procedural Background*

US1 operates a re-boxing facility that exports meat and other food products to customers in the Middle East.[4] Because

---

[4] That is, US1 purchases vacuum-sealed meat products from an official establishment and then re-boxes those products in packaging

US1 is a re-boxer, it is not subject to the mandatory FSIS inspection. *See* 21 U.S.C. § 608. Instead, US1 participates in the AMA voluntary FSIS inspection services. *See* 7 U.S.C. § 1622; 9 C.F.R. § 350.3(a). In January 2012, US1 ceased including its establishment number—"V21467"—on its labeling; instead, it replaced "21467" with the FSIS-assigned number of the official establishment from which US1 purchased meat products. The following is a depiction of the two different marks:

 

*Compare* Letter, *United Source One, Inc. v. USDA*, Case No. 16-1209 (D.C. Cir. April 28, 2017) (arrow added) (US1 establishment number), *with* JA 67 (arrow added) (supplier establishment number). US1 continued this practice for three years.

On January 27, 2015, an FSIS inspector determined that US1 did not have its supplier's consent to include the latter's establishment number on its label. Accordingly, the Office of Field Operations ("OFO"), FSIS, "refuse[d] to authorize" US1's continued use of its supplier's "inspection legend and establishment number." JA 112. Viewing the consent requirement as an unannounced policy change, US1 "request[ed] the FSIS [inspector] assigned to United Source One be advised to allow the warehouse to resume re-boxing

---

bearing a label with US1's name, address**,** branding ("Great Plains") and the FSIS inspection mark.

product and applying the originating plant establishment number." JA 15. In response, the FSIS upheld its inspector's action, noting that US1 "must have permission from the supplier to apply [its] establishment number to re-packaged product." JA 17. Subsequently, the FSIS explained that, if a re-boxing facility uses an official establishment's number, "it [is] readily transparent that the producing establishment was authorizing the use of their labels because they were physically shipped by the producer to the receiving establishment or ID warehouse for use." JA 75. But US1's supplier did not ship its labels to US1; instead, US1 apparently printed labels with the supplier's establishment number without that supplier's consent/knowledge. JA 75 ("In this case, the labels are printed at [US1's] warehouse with another establishment's (i.e., the producer's) number on it.").[5]

US1 then appealed the decision, first to the FSIS Assistant Administrator and, ultimately, to the FSIS Administrator. JA 81-83, 112-17. In his final determination, the Administrator concluded, *inter alia*, that "[a]bsent a documented transfer of labels, or other records that would assure FSIS of the knowledge, consent, or direction of the owner of the official establishment number, FSIS has reason to believe that the consuming public may be misled by application of the [supplier's] official mark of inspection" on US1's packaging. JA 117. The Administrator emphasized that, consistent with Directive 12,600.1, a re-boxer uses a supplier's establishment number only with that supplier's consent, consent effected by,

---

[5]   THE COURT: Mr. Gardner, where did you get the label from the original source? Did you print it?

MR. GARDNER: We printed it. Yes, Your Honor.

Oral Arg. Tr. 3.

*inter alia*, the supplier transferring its labels to the re-boxer—
"[t]ransfer of labels itself provides clear knowledge and consent
of the use of an establishment's inspection legend."[6] JA 114.
He concluded, "US1's printing of labels, re-boxing, application
of labels, and other handling of the product in question was
done absent of [sic] the knowledge, direction, or control of the
originating establishment," JA 114, and, further, that "[w]ithout
some form of documentation providing some means of written
consent for the use of an establishment's official inspection
legend, FSIS is unable to determine that the label is not
misleading to the consumer, and cannot authorize its use," JA
115. The Administrator thus deemed US1's label "misleading,
therefore providing a false impression, and misbranded by
definition under 21 U.S.C. [§] 601" and denied US1's appeal.
JA 114. US1 then filed a timely petition for review. Our
jurisdiction is based on 21 U.S.C. § 607(e).

## II. ANALYSIS

Because the FMIA and implementing regulations plainly
authorize the FSIS to withhold from use labeling that is "false
or misleading in any particular," 21 U.S.C. § 607(e), we review
its decision for reasonableness under the familiar arbitrary and
capricious review standard of the Administrative Procedure Act
("APA"). 5 U.S.C. § 706 (directing court to "hold unlawful and
set aside agency action, findings, and conclusions found to be .
. . arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law"); *see also Arent v. Shalala*, 70 F.3d
610, 616 (D.C. Cir. 1995). "The scope of review under the

---

[6] FSIS Directive 12,600.1 requires "[t]he [re-boxing] facility . . .
[to] maintain records of label transfers . . . to identify properly the
product origin in the event of a product control problem . . . ."
Directive 12,600.1 at 8-9; *see also id.* at 8 ("Inspection program
personnel will verify that facilities are using approved labels,
wrappers, or containers bearing the official mark of inspection.").

'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). We must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). Although we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *id.* (internal quotation marks omitted) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)), we cannot "supply a reasoned basis for the agency's action that the agency itself has not given," *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Applying this standard here, we believe that the FSIS's determination that US1's labeling is misleading is neither arbitrary nor capricious. In his final determination, the Administrator noted that the FSIS permits a re-boxer to use its supplier's establishment number only if the supplier consents to the practice, consent "historically" given by transferring its labels containing its establishment number to the re-boxer. JA 114 ("FSIS has previously explained that labeling policies and the regulations have historically permitted official establishments to arrange for off-site labeling/re-labeling of their product at approved [re-boxing] facilities, by transferring their labels, bearing their official inspection legend, to such facilities, provided documentation of such transfers and other applicable records are made available to inspection personnel."); *accord* Directive 12,600.1 at 8 ("The [re-boxing] facility must maintain records of label transfers and records of products labeled or relabeled at the facility . . . ."). The Administrator further found that "US1 has not provided documentation as requested, in accordance with 9 CFR 320.1(b)(11), showing consent of the official establishment."

JA 114. US1's use of a supplier's establishment number, then, does not simply—and erroneously—signify that one five-digit number is, or can be, interchangeable with another without more; instead, it signifies that US1 has the supplier's consent to use the supplier's establishment number on US1's packaging. But that signification is false—US1 printed its supplier's inspection mark at its own facility without the latter's consent and incorporated it as part of its label. JA 75. We believe the Administrator reasonably concluded that

> [a]bsent a documented transfer of labels, or other records . . . assur[ing] FSIS of the knowledge, consent, or direction . . . of the official establishment number, FSIS has reason to believe that the consuming public may be misled by application of the official mark of inspection. FSIS cannot authorize application of any label to a meat or poultry product when there is reason to believe that its use has the effect of causing such articles to become misbranded.

JA 117; *see also* JA 114 (US1's labeling "provide[d] a false impression, and [was therefore] misbranded by definition under 21 U.S.C. [§] 601."). On these facts, we conclude that the FSIS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Although the Administrator's analysis is less than pellucid, we must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp.*, 419 U.S. at 286).

US1 makes various counterarguments but none is persuasive. First, US1 insists that the Administrator's final determination is "not in accordance with law," reciting 9 C.F.R. § 350.3(a)(1)—the AMA regulation under which US1

voluntarily participates in the FSIS inspection program—that an FSIS inspector place the "marks of Federal inspection" on a meat product's label before resale. Examples of the "official marks" of federal inspection are set forth in 9 C.F.R. § 312.2 and, as noted, the number "38" is used. *See supra* 3. Footnote 1 of that regulation explains that the "number '38' is given as an example only" and that the "establishment number of the official establishment where the product is prepared *shall be used* in lieu thereof." 9 C.F.R. § 312.2 n.1 (emphasis added). Because footnote 1 recites that the *official establishment's* number "shall be used" in place of "38," US1 insists that it is entitled to—indeed, *required to*—use the establishment number of its supplier—the "official establishment"—instead of its own, irrespective of the official establishment's consent. We disagree. Footnote 1 merely makes plain that the official establishment is to use *its* establishment number instead of the placeholder "38." *See id.*

Next, US1 argues that the FSIS's consent requirement constitutes a new "legislative rule" and is invalid because it was not promulgated in accordance with the APA. Granted, we have often said that "[l]egislative rules have the 'force and effect of law' and may be promulgated only after public notice and comment." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014). But no new rule was promulgated here. The Administrator's final determination does not impose any *new* legal obligation on US1; instead, it *enforces* a preexisting prohibition of misleading labeling set forth in the FMIA and implementing regulations. *See* 21 U.S.C. §§ 601(n)(1), 607(e), 610(d); 9 C.F.R. § 317.8(a).

Finally, US1 insists that the Administrator's final determination represents an unexplained departure from agency precedent because US1, while subject to FSIS inspection, used its supplier's establishment number on its labels for three years without complaint. "[W]here an agency departs from

established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995). But there was no departure from *precedent*—no "prior policies and standards [were] deliberately changed." *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). Instead, the FSIS, albeit tardily, rectified its inspectors' apparently isolated (on this record) failure to verify that US1 had its supplier's consent to use the latter's establishment number. Although the non-enforcement is lamentable, especially on the part of personnel charged with ensuring the "health and welfare of consumers," 21 U.S.C. § 602, we discern no FSIS "depart[ure] from established precedent." *ANR Pipeline Co.*, 71 F.3d at 901.

For the foregoing reasons, the petition for review is denied.[7]

*So ordered.*

---

[7] Regarding the dissenting opinion, we and our dissenting colleague are like ships passing in the night. Of course he is right that a *rule* must be preceded by notice and comment and that, if that procedure is leapfrogged, the *rule* is ultra vires and cannot be enforced. No argument there. But we are not dealing with an unenforceable rule—the FSIS determined that the properly promulgated (and unchallenged) regulation prohibiting misleading and misbranded labeling was violated by US1's failure to follow Directive 12,600.1. That failure produced a false label.

Next, the dissent points out that the FSIS does not contend "that United Source One obtained the meat anywhere other than [from] the original establishment." Dissent Op. 2. True. It does contend, however, and US1 admits, that the supplier's *label* was not obtained

therefrom but was instead printed by US1 itself, necessarily without its source's consent.

Finally, the dissent apparently differentiates between a label violation and "a violation of conduct," concluding that the former does not "cure the defective source of the nonexistent regulation." Dissent Op. 2. Unsure of what is meant by a "violation of conduct," we again respond that US1's use of its supplier's establishment number is "misleading" because it signifies that US1 has the supplier's consent to use the latter's establishment number on US1's packaging. Directive 12,600.1 explains *why* US1's labeling is misleading.

SENTELLE, *Senior Circuit Judge*, dissenting:

> It is not substantially justifiable for an agency to persistently prosecute citizens for violating a regulation that does not exist. *Contractor's Sand & Gravel, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 199 F.3d 1335, 1341 (D.C. Cir. 2000).

No matter how many times I review the administrative record, it appears to me each time that the Food Safety and Inspection Service ("Service") is sanctioning United Source One, Inc. for violating the rule against using the original establishment number without the permission of the original establishment. The difficulty is there is no such rule. As the majority correctly notes, "[l]egislative rules have the 'force and effect of law' and may be promulgated only after public notice and comment." Maj. Op. at 13 (citing *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014)). The majority does not explain how an agency position mandating conduct on the part of a regulated entity can be something other than a legislative rule or how such a rule can come into existence without notice and comment.

The majority justifies its affirmance of the Service's decision by saying that "no new rule was promulgated here." Maj. Op. at 14. Again, I do not understand the majority's formulation. There is no record of any previous mandate that a re-boxer of meat must obtain the permission of the original establishment before using the original establishment number. If this is not a new rule, I know not what is. Indeed, even if there were such a record of enforcement, but no record of notice and comment proceedings, I would fail to see how such a rule could exist. At some point, whether in this proceeding or some prior one, the rule has been "new." Whenever it became new, it needed the proper procedures mandated by the Administrative Procedure Act in order to come into existence. *See generally*

5 U.S.C. §§ 553, 556-57.

The Service attempts to circumvent the difficulties of the lack of adoption of the rule by re-boxing the violation as a "mislabeling." It is mislabeling, the Service tells us, because it might improperly cause the ultimate consumer to believe that the shipper had complied with the rule requiring it to obtain permission from the original establishment. But if there is no such rule, then there is no misleading. The Service does not contend, nor is there any evidence, that United Source One obtained the meat anywhere other than the original establishment. The re-boxing by the Service as a labeling violation rather than a violation of conduct does not cure the defective source of the nonexistent regulation.

It may well be that the Service is correct that such a rule would be a good one. But that does not mean that it exists or that the Service has the authority to create it without following the process mandated by the Administrative Procedure Act. It seems to me a giant step in the progress of the administrative state to permit agencies to enforce regulations that do not exist against regulated entities. I know of no case in which we have previously permitted this. Indeed, in the closest I find, *Contractor's Sand and Gravel, supra,* we expressly held that an agency could not enforce nonexistent regulations. 199 F.3d at 1341. In that case, there was a regulation requiring the grounding of regulated equipment. The Mine Safety and Health Administration ("MSHA") cited a mine company for not using the MSHA's preferred method of grounding. *See id.* at 1336-38, 1341. The difficulty there was, though there was a regulation, it did not require a particular method of grounding. Like the Service in the present case, the MSHA offered good reasons why its decision to require certain conduct was a sound one. We held that the agency's position not only did not provide a sufficient foundation to enforce its decision, but also did not

even pass the more forgiving standard of the Equal Access to Justice Act that the government could be liable for litigation expenses where its conduct was not substantially justified. *See id.* at 1340-42. We further advised the Secretary of Labor that if the reasons for the nonexistent rule are good ones, then "it is time for the Secretary to repair to rulemaking, not to bring one more unsupportable citation." *Id.* at 1342.

Were I writing for the majority rather than in dissent, I would suggest in this case that if there is a good reason for requiring the secondary shipper to obtain the permission of the original establishment for the use of its number, then it is time for the Secretary of Agriculture to repair to the process of rulemaking.

I respectfully dissent.