# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 19, 2016      Decided December 6, 2016

No. 15-5170

SAFARI CLUB INTERNATIONAL AND NATIONAL RIFLE
ASSOCIATION OF AMERICA,
APPELLANTS

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00670)

———

*Douglas S. Burdin* argued the cause for appellants. With him on the briefs were *Christopher A. Conte*, *Michael T. Jean*, *Anna M. Seidman*, and *Jeremy E. Clare*.

*Erika B. Kranz*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *John C. Cruden*, Assistant Attorney General, and *Matthew Littleton* and *Meredith L. Flax*, Attorneys.

*Anna E. Frostic* was on the brief for *amici curiae* The Humane Society of the United States, et al. in support of appellees.

Before: ROGERS and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Although the African elephant is protected under both domestic and international law, the Interior Department's Fish and Wildlife Service has long allowed American hunters who shoot Tanzanian elephants to repatriate their trophies because, according to the Service, doing so "would not be detrimental to the survival of the species." 50 C.F.R. § 23.61(a). In 2014, however, the Service changed course and indefinitely suspended issuance of import permits due in part to a "significant decline in Tanzania's elephant population." 2014 Non-Detriment Finding, at Deferred Appendix 123. Two organizations representing hunters challenged the suspension in district court as substantively and procedurally flawed. Because no member of either group had applied for a permit, the court dismissed the case for lack of final agency action and for failure to exhaust administrative remedies. For the reasons set forth below, we reverse.

**I.**

The Fish and Wildlife Service, part of the U.S. Interior Department, is tasked with regulating the import of species protected under the Convention on International Trade of Endangered Species of Wild Fauna and Flora (CITES), Mar. 3, 1973, 27 U.S.T. 1087, which includes African elephants, or *Loxodonta africana*, from Tanzania. *See*, *e.g.*, CITES art. III(3) & App'x I; 16 U.S.C. §§ 1537a–1539; 50 C.F.R. §§ 17.11, 17.22. Among its duties, the Service determines whether and under what conditions hunters may receive permits to import "sport-hunted trophies," which "means a

whole dead animal or a readily recognizable part or derivative of an animal." 50 C.F.R. § 23.74(b).

The Service's permitting scheme is somewhat intricate, but because it has faced many legal challenges, the particulars have been thoroughly described in numerous opinions of this court. *See*, *e.g.*, *Marcum v. Salazar*, 694 F.3d 123, 124–25 (D.C. Cir. 2012). An abridged summary will do here.

For threatened species, like African elephants, the Service must ensure that two conditions are satisfied before it may grant a permit. First, the Service's Division of Scientific Authority must find that the "import will be for purposes which are not detrimental to the survival of the species." CITES art. III(3)(a); *see* 50 C.F.R. § 23.61. This determination is known as a "non-detriment" finding. Second, the Service's Division of Management Authority must find— the "enhancement" finding—"that the killing of the trophy animal will enhance the survival of the species." 50 C.F.R. § 17.40(e)(6)(i)(B). For example, sport hunting might enhance the survival of a species where it causes no measurable impact on its population and where "revenues generated by sport hunting[] ha[ve] the potential to provide conservation benefits to the species." January 3, 2014, Information Memorandum, at Deferred Appendix 122.

For the African elephant, along with a handful of other species, the Service makes annual, blanket non-detriment and enhancement findings that cover all applications filed for sport-hunted trophies "taken" during that year. Although the Service had long granted permits for sport-hunted Tanzanian elephant trophies—meaning it had consistently made positive non-detriment and enhancement findings—it reversed course in 2014. On February 21 of that year, the Division of Scientific Authority completed its non-detriment finding for

trophies taken during calendar year 2014. Acknowledging its history of finding sport hunting non-detrimental to the survival of Tanzanian elephants, the Division explained that it could no longer do so given the availability of more current information demonstrating a significant decline in elephant populations. The Division of Management Authority soon followed suit, concluding that it could no longer find that sport hunting would enhance the survival of the species. As a result, the Service announced a "suspension on imports of sport-hunted African elephant trophies taken in Tanzania . . . during calendar year 2014." *See* April 4, 2014, Press Release, at Deferred Appendix 161.

Challenging the Service's suspension, two industry groups, Appellants Safari Club International and the National Rifle Association (collectively, "Safari Club"), filed suit on behalf of their members, which include disappointed elephant hunters, several of whom had planned hunts in Tanzania for the fall of 2014. In its second amended complaint, Safari Club alleged that the Service's decisionmaking suffered from three flaws. First, it asserted that the 2014 non-detriment and enhancement findings were legislative rules requiring notice-and-comment rulemaking (Count VI). Second, it claimed that the Service failed to justify its decision to require an enhancement finding for African elephants (Count VII). And third, it alleged that the Service's non-detriment finding rested on an incorrect standard (Count VIII).

The district court dismissed the suit under Federal Rule of Civil Procedure 12(b)(6). Bypassing the Service's argument that Safari Club lacked Article III standing, the court concluded that the non-detriment and enhancement findings were not final agency action and that, by failing to apply for an import permit, Safari Club's members had failed to exhaust their administrative remedies. *See Safari Club*

*International v. Jewell*, 76 F. Supp. 3d 198, 207–08 (D.D.C. 2014).

Safari Club appeals, arguing that the Service's decision to suspend import permits—including the two 2014 findings—was final, and that its members had no obligation to exhaust administrative remedies. The Service defends the district court's dismissal for lack of finality and exhaustion, adding that Safari Club lacks standing and that its claims are moot. Our review is de novo. *See Cohen v. United States*, 650 F.3d 717, 722 (D.C. Cir. 2011) (reviewing de novo questions of subject matter jurisdiction and failure to state a claim).

## II.

The parties devote the bulk of their briefing to finality and exhaustion, but this puts the cart before the horse, for we must begin with our own jurisdiction. *Bender v. Williamsport Area School District*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review . . . ." (citation and internal quotation marks omitted)). To determine whether we and the district court have Article III jurisdiction, we must decide whether Safari Club has standing and whether its claims are moot. *See*, *e.g.*, *Worth v. Jackson*, 451 F.3d 854, 857 (D.C. Cir. 2006) (explaining that standing and mootness, along with ripeness, define the constitutional bounds of our subject-matter jurisdiction).

## A.

To demonstrate Article III standing, plaintiffs must "establish, as an 'irreducible constitutional minimum,' that they face 'injury in fact' caused by the challenged conduct and redressable through relief sought from the court." *Shays*

*v. Federal Election Commission*, 414 F.3d 76, 83 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61(1992)). An organization, like Safari Club, has Article III standing if one of its members has standing. *See Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009) ("[O]rganizations can assert the standing of their members."). The Service argues that Safari Club lacks standing because none of its members filed a permit application, meaning that the Club's injury stems from its members' inaction rather than from any decision by the Service. For its part, Safari Club insists that seeking a permit would have been futile given that the Service had determined and publicly announced that no permits would issue for Tanzanian elephants killed in 2014. According to the Service, however, futility can never excuse a nonapplicant's failure to seek a permit, adding that even were there a futility exception, Safari Club has failed to show futility here. We disagree with the Service on both counts.

It is true that "a plaintiff must generally . . . submit to a [government] policy to establish standing" to challenge it. *Grid Radio v. FCC*, 278 F.3d 1314, 1319 (D.C. Cir. 2002) (citation and internal quotation marks omitted). In the context of applications for government benefits, however, "'[t]his threshold requirement . . . may be excused . . . where a plaintiff makes a substantial showing that the application for the benefit . . . would have been futile.'" *Id.* (quoting *Prayze FM v. FCC*, 214 F.3d 245, 251 (2d Cir. 2000)); *see United States v. Decastro*, 682 F.3d 160, 161, 164 (2d Cir. 2012) (recognizing futility exception for nonapplicant for firearm permit but finding no futility on summary-judgment record). Even our decision in *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49 (D.C. Cir. 1991), on which the Service itself relies, supports the existence of a futility exception. There, we held that a nonapplicant lacked Article III standing because the summary-judgment record contained no "evidence relating to

the asserted '*futility*' of applying" for government employment. *Id.* at 57 (emphasis added); *accord id.* at 62 (D.H. Ginsburg, J., concurring) ("A non-applicant would also have standing . . . to challenge as unlawful a policy . . . that has the effect of disqualifying her and rendering her application pointless.").

But does the record here show that submitting an application would have been futile? The Service says no, relying heavily on a statement from its non-detriment finding that if an applicant includes in its submission "new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis." 2014 Non-Detriment Finding, at Deferred Appendix 123. In the Service's view, this caveat saves the day by leaving open the possibility that applicants might have obtained a 2014 permit.

On closer examination, however, this possibility was illusory given the definitive nature of the Service's non-detriment and enhancement findings. Based on its review of the best biological information available as of February 2014, *see* 50 C.F.R. § 23.61(f), the Service found that Tanzanian elephants were suffering a "significant decline" in population, "primarily due to poaching." 2014 Non-Detriment Finding, at Deferred Appendix 123. Largely for that reason, the Service concluded that the "additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania." *Id.* at 133. Given this, an internal agency memorandum directed that "if an import permit application [for 2014] is received, the application will be denied." Targeted Communications

Strategy, at Deferred Appendix 137. True, in later years the Service might change its mind if it "receive[s] information that indicates a significant improvement for elephants in Tanzania." April 4, 2014, Letter from Bryan Arroyo, Assistant Director of International Affairs, to Hon. Lazaro Nyalandu, Tanzanian Minister of Natural Resources, at Deferred Appendix 223–24. That, however, hardly casts doubt on the conclusion that seeking a permit in 2014 would have been entirely futile.

The Service also argues that any harm to Safari Club's members is speculative because hunters might fail to "kill[] any elephants to import." Appellee's Br. at 38; *see Lujan*, 504 U.S. at 560 (injury must be "actual or imminent, not 'conjectural' or 'hypothetical'" (citation omitted)). But Safari Club is not arguing that its members are injured only when stopped at the border, trophy in tow. Instead, it claims an antecedent injury: the inability to obtain a permit in the first place. "We have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury." *See Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).

Because the de facto permit denial gives Safari Club Article III standing, we need not address its alternative theory for standing, namely that by requiring hunters to submit "new and additional information" with their applications, *see* 2014 Non-Detriment Finding, at Deferred Appendix 123, the Service increased the hunters' regulatory burden and cost of compliance. *See*, *e.g.*, *CropLife America v. EPA*, 329 F.3d 876, 883–84 (D.C. Cir. 2003). And because Safari Club's member hunters, and therefore Safari Club, have standing, we have no need to determine whether other individuals represented by Safari Club, including guides, outfitters, and

conservationists, have likewise suffered harm on account of the Service's decision. *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) ("'[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case.'" (quoting *Railway Labor Executives' Association v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993))).

## B.

We turn next to the Service's argument that the case has become moot. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726–27 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (per curiam). The Service argues that because the challenged findings pertain only to 2014, and because none of Safari Club's members killed an elephant during that year, "[n]either this Court nor the district court can afford Safari Club any relief with respect to the 2014 findings." Appellee's Br. at 25. This argument suffers from two fatal flaws.

First, the relief Safari Club seeks extends well beyond the two 2014 findings. Although the second amended complaint does challenge the now-expired 2014 findings (Count VI), it also speaks more broadly to whether the Service may require an enhancement finding at all (Count VII), as well as to whether it employed an incorrect standard when making its non-detriment finding (Count VIII). "It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action," as Safari Club does in Counts VII and VIII, "the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *City of Houston v.*

*Department of Housing & Urban Development*, 24 F.3d 1421, 1428 (D.C. Cir. 1994).

We applied that principle to a situation nearly identical to the one we face here in *Defenders of Wildlife v. Endangered Species Scientific Authority*, 659 F.2d 168 (D.C. Cir. 1981). There, the plaintiff challenged the Service's non-detriment findings for export of bobcats for a specific year. *See id.* at 175. Even though the hunting season for that year had long passed, we concluded that the case was not moot because the plaintiffs "more broadly . . . attack[ed] the standards federal agencies apply in approving bobcat exports." *Id.* Because Safari Club likewise "more broadly" challenges the standards by which the Service makes its elephant findings—Counts VII and VIII—those counts are similarly not moot.

Count VI, in which Safari Club alleges the Service failed to conduct notice-and-comment rulemaking for its 2014 findings, presents a different issue because Safari Club concedes that claim is moot but nonetheless argues that it falls within the narrow exception for quick-burning disputes that are "capable of repetition, yet evading review." *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (citation and internal quotation marks omitted). Specifically, although expiration of a government policy ordinarily moots a challenge to it, the controversy remains live if "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* (citation and internal quotation marks omitted).

*Defenders of Wildlife* once more guides our path. Although the relevant bobcat-hunting season had passed by the time the case reached this court, we nonetheless deemed

the dispute capable of repetition yet evading review. *See Defenders of Wildlife*, 659 F.2d at 175. As we explained, because the findings were both made and expired within a single hunting season, the window for litigating a challenge to the agency's decision was far too short. *See id.* Moreover, since the Service made clear that it would "apply[] the same criteria and . . . seek[] essentially the same types of information . . . in developing advice for the 1980–81 season," the plaintiff would have been subject to the same action again. *See id.* (citation and internal quotation marks omitted).

We see little to distinguish this case from *Defenders of Wildlife*. Here, as there, the findings "expire by [their] terms within a year," Appellee's Br. at 30, and the Service nowhere indicates that it will change the criteria by which they are made.

The Service nonetheless maintains that future challenges to the findings "will not evade review because there is no time limit for importing a trophy killed in a certain year." *Id.* at 29–30. By this, we assume the Service means that a hunter could have traveled abroad without a permit in 2014, shot an elephant, attempted to repatriate the trophy in a later year, and then challenged the Service's refusal to issue a permit. But Safari Club's alleged injury derives from the Service's refusal to issue a permit *in 2014*, and the purpose of that permit, as Safari Club argues and the Service concedes, is to give advanced assurance to hunters that if they invest in a hunting trip—"$100,000 for [a] hunt[,] . . . $10,000 for [a] plane ticket[,] . . . $50,000 in trophy fees[,] . . . and $50,000–70,000 in taxidermy costs," Decl. of Walter Allen Tarpley, at Deferred Appendix 179—they will be allowed to return with trophies. *See id.* ("If I am unable to import my elephant trophy, I will not participate in the elephant portion of the

hunt."); Decl. of Timothy Van Norman, Chief of Permits Branch, Division of Management Authority, at Deferred Appendix 200 ("By applying [for a permit] before traveling, the hunter can, in many cases, make adjustments to their hunting trip, if desired, based on the FWS determination on whether a permit can be issued."). Because Safari Club is unable to fully litigate a challenge to the findings underlying the suspension without taking on risk that the permitting scheme is designed to avoid, the controversy evades review. *See LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998) (controversy must be "*by its very nature short in duration*, so that it could not, or probably would not, be able to be adjudicated while fully live." (citation and internal quotation marks omitted)).

## III.

Having assured ourselves of our jurisdiction, we turn to the Service's arguments relating to finality and exhaustion.

The Service argues that because the hunters failed to apply for a permit, it "has not yet been given an opportunity to render a final decision regarding an import permit," meaning "there is no final decision for this Court to review." Appellee's Br. at 49. Under the Administrative Procedure Act, an agency action is final if it meets two conditions. First, it must "mark the consummation of the agency's decisionmaking process," *i.e.*, it is not "merely tentative or interlocutory." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and internal quotation marks omitted). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation and internal quotation marks omitted). The finality inquiry "is a 'pragmatic' and 'flexible' one." *National Association of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1279 (D.C. Cir. 2005).

As to the first factor, the Service argues that its two findings were tentative, "predicate" determinations "subject to amendment based on new information." *See* Appellee's Br. at 13, 50–51. We disagree. As explained above, *supra* Part II.A, the findings represented the agency's final decision that no permit would issue for the 2014 calendar year. *See*, *e.g.*, Targeted Communications Strategy, at Deferred Appendix 137 (noting that the 2014 findings operated to "prohibit import of sport-hunted elephant trophies from Tanzania"). In addition, the content of the two findings reveals a considered determination, based on a thorough examination of recent biological studies, elephant population data, Treaty reports, and official documents from the Tanzanian government. The "possibility" that the Service "may revise [its decision] . . . based on 'new information' . . . is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016). In short, the suspension was not a "moving target," but a "final and binding determination." *See Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992).

The definitiveness of the Service's position also leads inexorably to the conclusion that Safari Club's "rights . . . have been determined." *Bennett*, 520 U.S. at 178 (citation and internal quotation marks omitted). For all practical purposes, the findings represented a de facto denial of permits for any Safari Club member wishing to import sport-hunted elephant trophies from Tanzania for 2014—that is, a "result . . . that . . . directly affect[s] the parties." *Franklin*, 505 U.S. at 797.

Contrary to the Service, nothing in *National Mining Association v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014),

requires a different result. There, we held that the challenged agency action—an Environmental Protection Agency guidance—was not final because it amounted to nothing more than a recommendation that petitioners were "free to ignore." *Id.* at 252 (internal quotation marks omitted). To be sure, we recognized that "parties may feel pressure to voluntarily conform their behavior" to agency guidance where it seems "the writing is on the wall." *Id.* at 253. For the petitioners in that case, however, the writing was not on the wall. Here it is. The Service has made abundantly clear that it would grant no permits for 2014. *See supra* Part II.A.

The Service's final argument—that Safari Club failed to exhaust its administrative remedies—is absurd. The remedies of "reconsideration" and "appeal" that the Service points to are available only to those who apply for a permit and have it denied. *See* 50 C.F.R. § 13.29(a) (persons who "may request reconsideration" include "[a]n applicant for a permit who has received written notice of denial"); *id.* § 13.29(e) ("A person who has received an adverse decision [following a] request for reconsideration may submit a written appeal."). In this case the Service had nothing to "reconsider," as Safari Club never sought, nor was obliged to seek, a permit for 2014.

Insisting that Safari Club nonetheless failed to exhaust its administrative remedies, the Service cites our decision in *Marcum v. Salazar*, 694 F.3d 123 (D.C. Cir. 2012). There, after the Service denied import permits for Zambian elephant trophies, *see id.* at 124–25, hunters brought near-simultaneous challenges to the permit denials in two separate forums: one administratively before the Service and another before the district court, the latter of which granted summary judgment to the government without realizing that the hunters' administrative appeals remained pending, *see id.* at 125–26. Because the district court "unknowingly decided the case

without the full administrative record before it," we concluded that the matter was unripe. *Id.* at 129. But we did not hold that applicants faced with a total ban on permits must nonetheless seek a permit and then challenge the agency's preordained denial in administrative proceedings.

## IV.

For the foregoing reasons, we reverse and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*