Millett, Circuit Judge, dissenting:
Why let reality get in the way of a good bureaucratic construct? In holding that the 2016 Letter from the Federal Trade Commission's Division of Marketing Practices is not a judicially reviewable "final agency action," the court's opinion focuses on the Commission's structuring of its own regulations to preserve its right to disagree (or not) with the Division at some "later" date. 16 C.F.R. § 1.3(c). In so doing, the court's opinion measures finality exclusively from the Commission's vantage point.
But there are two sides to this story. Finality is supposed to look at both whether "the agency's decisionmaking process" has "consummat[ed]," and the reality of whether "rights or obligations have been determined" by or "legal consequences will flow" from the challenged agency action. Bennett v. Spear , 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks and citations omitted).
*1275 And in deciding whether the agency process has ended for purposes of Bennett 's first prong, courts must look beyond the agency's say-so to objective and practical indicia of finality. See , e.g. , Sackett v. EPA , 566 U.S. 120, 127, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012) (holding that compliance order that triggers potential penalties is final even though agency provided for ongoing "informal discussion" and consideration of the accuracy of its findings).
In this case, the agency's emphatic and directive language in the 2016 Division Letter, combined with the absence of any avenue for internal administrative review, unleashes immediate legal and practical consequences for the industry, forcing its members to choose between complying by shuttering their businesses or exposing themselves to potentially significant financial penalties. When agency action threatens such severe repercussions, the "mere possibility that an agency might reconsider" does not deprive the action of finality. Sackett , 566 U.S. at 127, 132 S.Ct. 1367.
In my view, the Administrative Procedure Act should not countenance an agency telling an individual or industry that its business must end, while fending off court review on the ground that its own internal administrative processes have not ended. Because the structure of the Commission's regulations, the substantive content of the Division's Letter, the absence of an internal appeal mechanism, and the consequences that flow from it together render the Division's 2016 Letter the end of the agency's process, I respectfully dissent.
A
Courts must examine finality in a "flexible" and "pragmatic way," considering the impact of delayed review on both the agency action and the regulated entities. Ciba-Geigy v. EPA , 801 F.2d 430, 435 (D.C. Cir. 1986) (internal quotation marks and citation omitted); see United States Army Corps of Engineers v. Hawkes Co. , --- U.S. ----, 136 S.Ct. 1807, 1815, 195 L.Ed.2d 77 (2016) (applying the " 'pragmatic' approach we have long taken to finality"); Federal Trade Comm'n v. Standard Oil Co. , 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) ("[C]ases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way.") (quoting Abbott Laboratories v. Gardner , 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ).
Applying that pragmatic test, I acknowledge that the Federal Trade Commission has dressed the Division's advice up with some of the trappings of non-finality. Commission regulations say that "[a]dvice rendered by the staff is without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement proceeding." 16 C.F.R. § 1.3(c). Also, the Division says in its 2016 Letter that it is "express[ing]" only the views of Commission "staff," and that the Letter has "not been approved or adopted by the Commission," nor is it "binding upon the Commission." Letter from Lois C. Greisman, Assoc. Dir., Div. Mktg. Practices, to Michael Bills, Former Chief Exec. Officer, Call Assistant 4 (Nov. 10, 2016) ("2016 Division Letter").[1]
But a closer look at the Commission's regulations governing agency advice reveals the 2016 Division Letter to be, for all practical purposes, a definitive agency position that concludes the administrative process for the foreseeable future.
*1276 First , advisory opinions by different divisions of the Commission are not some independent or detached endeavor. Instead, all requests for advisory opinions must first be submitted to the Secretary of the Commission. 16 C.F.R. § 1.2(a). Then, "[o]n the basis of the materials submitted, as well as any other information available," the Commission "will inform the requesting party of its views," id. § 1.3(a), through either the issuance of an opinion by the Commission itself, id . § 1.1(a), or the Commission deputizing agency staff to "render [the] advice," id. § 1.1(b) ; see id . ("The Commission has authorized its staff to consider all requests for advice and to render advice, where practicable, in those circumstances in which a Commission opinion would not be warranted."); see 16 C.F.R. § 0.7 ("The Commission * * * may delegate, by published order or rule, certain of its functions to a division of the Commission * * * or an employee * * *.").[2]
As a result, when staff issues advisory opinions to industry, it does so at the Commission's direction and as its delegate. For this case, that means the Commission itself has already decided that this matter does not warrant a Commission decision and is best handled by delegating the decision to the enforcement Division.[3] In fact, leaving Division staff to provide regulatory advice appears to be par for the course with the Commission. Of the 59 advisory opinions published on the Commission's website, 57 have been issued by staff; only 2 were issued by the Commission itself. See FED. TRADE COMM'N , Advisory Opinions , https://www.ftc.gov/policy/advisory-opinions (last visited April 17, 2018). And neither of those Commission decisions purported to review a staff advisory opinion.[4] That pattern of regulatory delegation of decisions to staff weighs in favor of finality. See Kobach v. Election Assistance Comm'n , 772 F.3d 1183, 1190 (10th Cir. 2014) (finding that internal delegation to Executive Director of the Election Assistance *1277 Commission rendered his decision final).
That the regulation says it "authorize[s]" staff to render advice, rather than "delegates" to staff, is neither here nor there semantically. See Op. at 1269-70. The ordinary meaning of "authorizes" is to empower a person to act or speak for another. See BLACK'S LAW DICTIONARY 123 (5th ed. 1979) (defining "authorize" as "[t]o endow with authority or effective legal power, warrant, or right."); see also MERRIAM-WEBSTER ("[T]o endorse, empower, justify, or permit by or as if by some recognized or proper authority .") (emphasis added); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 89 (New College ed. 1976) ("To grant authority or power to."). That is also what a delegation does. See THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 349 (New College ed. 1976) (defining "delegate" as "to commit to one's agent or representative."). Here, the Commission specifically decided that the Division was best suited to speak on this matter, and that the Commission would not weigh in. It is that fact of deputization that matters in determining finality, not which synonym for conferring authority the agency uses.
Second , nothing in the regulations governing advisory opinions labels those delegated decisions as non-final or just a first round in the agency process. Instead, the regulatory scheme treats the advisory letter as concluding the process for obtaining the agency's position on legal matters. 16 C.F.R. § 1.3(a) (request for Commission advice will be answered by either "the Commission or its staff * * * inform[ing] the requesting party of its views").
Notably, the Commission's regulations do not provide a process for appealing or obtaining any form of internal review of staff opinions. Instead, the decision whether to issue advisory opinions directly or through agency staff rests exclusively with the Commission. 16 C.F.R. § 1.2(a), 1.3(a). Individuals seeking agency advice cannot control that decision, no matter how many times they might try to get the Commission itself to weigh in. See also Oral Arg. Tr. 31-32 (Commission counsel acknowledges that, while the Association "certainly could make the request" for review of the Division's decision, "the Commission [is] not certainly bound to issue an opinion[.]"). And as mentioned, precious few requests succeed in prompting the Commission to weigh in. If the Commission itself answers only 3% of requests for advice, as its history suggests, and if the Commission has never once intervened to "review" the opinion of its subdivisions, the numbers themselves evidence that the Division's advice here was the agency's final word.
Like the Sacketts, Soundboard has no "entitlement to further agency review." Sackett , 566 U.S. at 127, 132 S.Ct. 1367 (emphasis added). The court is unmoved, reasoning that Soundboard could either request an advisory opinion from the Commission or await enforcement. Op. at 1268-69. But the Commission has already decided that this issue does not meet the criteria for a Commission opinion. Soundboard's ability to keep knocking on a door that will not open is as beside the point here as it was in Sackett: "The mere possibility that an agency might reconsider * * * does not suffice to make an otherwise final action nonfinal." Sackett , 566 U.S. at 127, 132 S.Ct. 1367 ; see also Hawkes Co. , 136 S.Ct. at 1814 (where the agency decision is typically not revisited, the "possibility" of further consideration "does not make an otherwise definitive decision nonfinal").
Nor does the option to await a penalty-seeking civil enforcement action strip agency action of finality. The Supreme Court has repeatedly held that parties *1278 need not "wait[ ] for [the agency] to drop the hammer in order to have their day in court." Hawkes Co. , 136 S.Ct. at 1815 (internal quotation marks omitted); see Sackett , 566 U.S. at 127, 132 S.Ct. 1367 ("But the Sacketts cannot initiate [an enforcement] process, and each day they wait for the agency to drop the hammer, they accrue, by the Government's telling, an additional $75,000 in potential liability."); see also Free Enter. Fund v. Public Co. Accounting Oversight Bd ., 561 U.S. 477, 490, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law.") (internal quotation marks, citation, and alteration omitted).
Third , while the Commission emphasizes that the regulations expressly reserve its right "later to rescind the advice" of staff, 16 C.F.R. § 1.3(c), that language actually supports finality. To begin with, the same qualification about potential rescission applies, almost verbatim, to indisputably final Commission opinions. Id. § 1.3(b) ("Any advice given by the Commission is without prejudice to the right of the Commission to reconsider the question involved, and, where the public interest requires, to rescind or revoke the action."). Indeed, even without that regulatory reservation, the ability of agencies to reverse course is well-settled, so long as they reasonably explain themselves. See Telecommunications Research & Action Ctr. v. Federal Communications Comm'n , 26 F.3d 185, 193 (D.C. Cir. 1994) ("We have long recognized that an agency's view of what is in the public interest may change * * *. When that happens, we require only that the agency changing its course supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (internal quotation marks, alterations, and citation omitted).[5]
In addition, the regulation's requirement that the Commission "rescind" Division opinions underscores that, unless the Commission takes that affirmative step, the Division opinion operates as a statement of the agency's position. After all, "rescind" means "[t]o make void; to repeal or annul" a legally operative document, as in to "rescind the legislation." BLACK'S LAW DICTIONARY 1499 (10th ed. 2009); see also THE NEW OXFORD AMERICAN DICTIONARY (2d ed. 2005) (defining "rescind" as to "revoke, cancel, or repeal (a law, order, or agreement): the government eventually rescinded the directive "). One does not "rescind" a mere suggestion or informal advice.
Further, the regulation speaks only of the Commission reserving the power to rescind the staff opinion "later." 16 C.F.R. § 1.3(c). Framed that way, the ability to rescind is just a tool the Commission keeps in its back pocket; it does not mean that Division advice that the Commission chooses to leave in place is only half-baked or tentative. The opposite is true. Once staff "inform[s] the requesting party of its views," id. § 1.3(a), that is the agency's final answer, unless and until there is a later change of heart. The simple fact that the Division's decision could (or could not) "be altered in the future has nothing to do with whether it is subject to judicial review at the moment." Appalachian Power Co. v. EPA , 208 F.3d 1015, 1022 (D.C. Cir. 2000) ; see id . at 1023 (concluding that interpretive and policy statements may constitute final, consummated action if they are otherwise "final" in nature).
*1279 Fourth , the Administrative Procedure Act is explicit that an agency action remains reviewable "final" agency action notwithstanding the availability of appeal to a "superior agency authority," unless agency rules render the initial agency decision "inoperative" pending such appeal. 5 U.S.C. § 704. Nothing in the Commission's regulations provide for appeal to the Commission, let alone render the Division's 2016 Letter inoperative until reviewed. To the contrary, the regulations are explicit that whatever opinion issues is the Commission's answer to the request for its views, 16 C.F.R. § 1.3(a), and the decision will take effect on whatever date the staff decides-here, May 12, 2017. See 2016 Division Letter, supra , at 4 ("[T]he revocation of the September 2009 letter will be effective six months from today, on May 12, 2017."). In short, as in Sackett , the Commission's regulations provide "no entitlement to further agency review," 566 U.S. at 127, 132 S.Ct. 1367, or even a second bite at the advisory apple.
The opinion for the court also points out that staff decisions do not afford regulated entities the same "safe harbor" protections from enforcement as formal Commission opinions do. Op. at 1269-70; see 16 C.F.R. § 1.3(b) (providing that, when all relevant facts have been disclosed and agency orders complied with, the "Commission will not proceed against the requesting party with respect to any action taken in good faith reliance upon the Commission's advice under this section").
The regulations certainly do make that formal distinction. But it bears noting that the Commission in an enforcement action cannot extract penalties unless the defendant had "actual knowledge or knowledge fairly implied * * * that [its] act is unfair or deceptive and is prohibited by [Commission] rule." 15 U.S.C. § 45(m)(1). Reasonable reliance on a staff advisory opinion would thus seem to inoculate the regulated entity against liability for penalties. Presumably that is why the soundboard industry continued its business practices without Commission challenge for seven years on the basis of the 2009 Division Letter advising that the Telemarketing Sales Rule did not apply. And presumably that is also why the Division felt obliged before reversing its legal position in the 2016 Letter to (i) undertake a months-long investigation, (ii) conduct multiple meetings with industry members, and (iii) afford industry members six months' lead time to come into compliance before enforcing the agency's new position.
In other words, while the formal protections differ for Commission-rendered advice, the differential in practice seems small, and whatever delta remains says nothing about the finality of the Division's 2016 Letter for purposes of judicial review.[6]
*1280 B
Consistent with that regulatory structure, the 2016 Division Letter itself speaks in final, conduct-altering, and compliance-demanding terms, leaving the regulated businesses to either knuckle under or face a penalty-seeking enforcement action.
1
To begin with, the Letter states unqualifiedly that telemarketing calls using soundboard technology "are subject" to the "plain language of the [Telemarketing Sales] [R]ule," 16 C.F.R. § 310.4(b)(1)(v). 2016 Division Letter, supra , at 3. So going forward, calls "can only be made legally if they comply with the [rule's] requirements." Id. (emphasis added). For both agency officials on the sending end and industry on the receiving end, there is nothing preliminary, tentative, or qualified about that message.
In case that shot across the industry's bow were not warning enough, the 2016 Division Letter then gives notice that the newly announced application of the Telemarketing Sales Rule to soundboard technology "will be effective six months from today." 2016 Division Letter, supra , at 4. That six-month lead time, the Letter explains, is to afford the industry sufficient time to "make [the] necessary changes to bring themselves into compliance" with the law. Id. The agency thus "views its deliberative process as sufficiently final to demand compliance with its announced position." Ciba-Geigy , 801 F.2d at 436. And when agency action is final enough that business-ending compliance is expected by a date certain, it should be final enough for judicial review. What is final for the goose should be final for the gander.
The 2016 Division Letter also identifies no avenue for further Commission review on the question. Worse, the Letter snuffs out any hope for a change of heart by explaining that its broadside against the use of soundboard technology in telemarketing calls is commanded by the "plain language" and "plain meaning" of the Telemarketing Sales Rule. 2016 Division Letter, supra , at 3. Specifically, the Division said:
The plain language of the [Telemarketing Sales Rule] provision governing prerecorded calls imposes restrictions on "any outbound telephone call that delivers a prerecorded message." It is indisputable that calls made using soundboard technology deliver prerecorded messages. As such, under the plain meaning of the words in the [Telemarketing Sales Rule's] prerecorded call provision, outbound telemarketing calls using soundboard technology are covered because such calls "deliver a prerecorded message."
Id . The Division's position thus "admit[s] of no ambiguity" or possibility of modification. Ciba-Geigy , 801 F.2d at 437. If, as the Commission acknowledges, Appellee Br. 53-54, the Telemarketing Sales Rule on its face plainly foreordains the 2016 Letter's conclusion, exactly what more is industry supposed to wait for?
Even more importantly, the consequences to industry that flow from compliance with the Division's 2016 Letter are dire, "forc[ing] many users to downsize or close their doors altogether." Soundboard Br. 13. The Division knew this when issuing the letter. The Soundboard Association told the Division that extending the Telemarketing Sales Rule to soundboard technology would "decimate[ ] an industry" and "[e]liminate[ ] jobs for persons with a variety of disabilities[.]" J.A. 62. "Because the letter largely outlaws soundboard, the many businesses that manufacture or distribute soundboard technology will have no choice but to close down entirely or, at a *1281 minimum, dramatically scale back their operations. That will lead to the loss of thousands of jobs across those industries alone." J.A. 113 (quoting Declaration of Arthur F. Coombs III, Dkt. 2-2).
In addition, telling industry that telemarketing can no longer "lawfully" be undertaken with their technology will require industry "to scrap the soundboard technology systems in which they have invested millions of dollars and countless hours of development and training," and to "lay off many-and, in some cases, all-of the thousands of people whom the companies have trained and, for years, paid good salaries to[.]" Dkt. 2-2 at 11-12; see also Dkt. 2-2 at 10 (compliance with the 2016 Division Letter will "eliminate 80% or more of [company] revenue," and dampen sales even in areas not subject to the Telemarketing Sales Rule); Dkt. 2-3 at 3-4 (affirming that one company will be forced to make massive layoffs and will lose over $3 million invested in soundboard technology as a result of the Division's 2016 letter).
Neither the Commission nor the Division denies that those consequences will ensue.
To be sure, the 2016 Division Letter ends with the caveat that the advisory opinion has "not been approved or adopted by the Commission," and does "not bind[ ]" it. 2016 Division Letter, supra , at 4. But the 2016 Letter then quickly intones that it nonetheless "reflect[s] the views" of the Division "charged with enforcement of the [Telemarketing Sales Rule]." Id .[7] And the Commission, for its part, decided to publish the 2016 Letter on its website, right alongside Commission advice (which also takes the form of a letter to the requesting party).[8]
Anyhow, such boilerplate qualifications are not enough to fend off judicial review of otherwise final agency action. In Appalachian Power Co. , the EPA's advisory guidance contained an even more forceful caution, emphasizing that "[t]he policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party." 208 F.3d at 1023. Such "boilerplate," which the EPA-like Commission staff here-routinely included at the end of guidance documents, was not enough " 'to keep the proceduralizing courts at bay.' " Id. (quoting Peter L. Strauss, Comment, The Rulemaking Continuum , 41 DUKE L.J. 1463, 1485 (1992) ); see FED. TRADE COMM'N , Advisory Opinions , https://www.ftc.gov/policy/advisory-opinions (last visited April 17, 2018) (documenting that all of the Commission's staff advisory opinion letters contain the same or nearly identical cautionary language as the 2016 Letter).
Likewise, in Her Majesty the Queen in Right of Ontario v. EPA , 912 F.2d 1525 (D.C. Cir. 1990), we held that an assistant EPA administrator's letter constituted final agency action notwithstanding a concluding demurral that the letter represented only the assistant's personal thoughts and not those of the agency, id . at 1532. What mattered was that the assistant, who was the principal advisor for the matters at issue, laid out a decidedly non-tentative interpretation of the governing statute that was "unambiguous and devoid of any *1282 suggestion that it might be subject to subsequent revision." Id .
So too here. The Division's 2016 Letter speaks with the announced authority and expertise of the Telemarketing Sales Rule's enforcer. There is nothing tentative or interlocutory about its declaration that the plain meaning of federal law requires Association members to shutter most if not all of their telemarketing business. Nor is there any administrative appeal process. In other words, the writing is on the wall, and a line of routine boilerplate cannot erase it.
2
The final straw that collapses the Commission's claim of non-finality is the "legal consequences [that] flow" from the 2016 Division Letter. Sackett , 566 U.S. at 126, 132 S.Ct. 1367 (internal quotation marks, citation, and alterations omitted). Federal law empowers the Commission to file civil enforcement actions for penalties against those who violate Commission rules governing unfair or deceptive trade practices, including the Telemarketing Sales Rule, if the defendants had "actual knowledge or knowledge fairly implied" that their conduct was "prohibited by such rule." 15 U.S.C. § 45(m)(1) ; see 16 C.F.R. § 1.98 (addressing penalty amounts). Each individual "violation" subjects the offender to up to a roughly $40,000 penalty, 16 C.F.R. § 1.98. And for ongoing violations, each day the conduct continues "shall be treated as a separate violation," 15 U.S.C. § 45(m)(1)(C). Penalties could thus quickly snowball into more than $1 million a month or roughly $14.5 million a year for each single contract held by a soundboard company.[9]
As counsel for the Commission agreed at oral argument, the specificity and directness of the 2016 Division Letter's conclusion that the Telemarketing Sales Rule outlaws the use of soundboard technology "certainly[ ] * * * would be a factor" in establishing the knowledge required to trigger an enforcement action and financial penalties, and it is something that "a reasonable business would take into account." Oral Arg. Tr. 33. Given the 2016 Letter's warning to industry that the use of soundboard technology is "plain[ly]" unlawful, 2016 Division Letter, supra , at 3, any failure to comply would put a business at substantial risk of not only an enforcement action, but also significant penalties running back to the date of this so-called non-final Letter. The 2016 Division Letter thus is not, as the court's opinion would have it (Op. 24), mere "evidence." Op. at 1273. The Letter lights the liability fuse; it is the difference between severe financial penalties and no penalties at all. See Sackett , 566 U.S. at 120, 132 S.Ct. 1367 (noting that legal consequences flow from the EPA's order because it "exposes the Sacketts to double penalties in future enforcement proceedings").
*1283 The Division's message to industry is clear: Proceed at your own peril. Finality principles will not allow the Commission to brush off that "immediate and practical impact" of the Division's announcement. Frozen Food Express v. United States , 351 U.S. 40, 44, 76 S.Ct. 569, 100 L.Ed. 910 (1956). The clear and explicit announcement in the 2016 Division Letter about the reach of the Telemarketing Sales Rule's "plain language," 2016 Division Letter, supra , at 3, "warns" every member of the soundboard industry to either reshape "the manner in which an important segment of the * * * business will be done" or run the "risk" of civil penalties, Frozen Food Express , 351 U.S. at 44, 76 S.Ct. 569. When an agency's "authoritative interpretation" and demand for "compliance" means business's "only alternative to costly compliance" is "to run the risk of serious civil * * * penalties," finality attaches and the time for judicial review has come. Ciba-Geigy , 801 F.2d at 437-439 ; see Hawkes Co. , 136 S.Ct. at 1815 (holding that parties "need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and civil penalties"); Sackett , 566 U.S. at 126, 132 S.Ct. 1367 (finding that the Army Corps' action had "all of the hallmarks of APA finality that our opinions establish" because, inter alia , it "exposes the Sacketts to double penalties in a future enforcement proceeding"); Rhea Lana, Inc. v. Department of Labor , 824 F.3d 1023, 1025 (D.C. Cir. 2016) ("By notifying Rhea Lana that the company was in violation of its wage-and-hour obligations, the letter rendered knowing any infraction in the face of such notice, and made Rhea Lana susceptible to willfulness penalties that would not otherwise apply.").
Also, the risks to which the soundboard industry is exposed in this case are magnified because the 2016 Letter threatens enforcement actions and substantial penalties against speech. Given the Telemarketing Sales Rule's varied prohibitions and exceptions pertaining to the scope of outlawed speech, the "legal consequences [that] flow" from the 2016 Letter include the chilling of potentially constitutionally protected speech. Bennett , 520 U.S at 178, 117 S.Ct. 1154 ; cf. Sorrell v. IMS Health Inc. , 564 U.S. 552, 580, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (striking down selectively imposed content- and speaker-based burdens on the commercial speech of pharmaceutical manufacturers as unconstitutional under the First Amendment).
Accordingly, the Division's declaration that the soundboard industry needs to shut up and shut down by a date certain should weigh heavily in the finality calculus. See Cox Broad. Corp. v. Cohn , 420 U.S. 469, 485-486, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (finding state court decision "final" in part because "[d]elaying final decision of the First Amendment claim until after trial will leave unanswered an important question of freedom of the press under the First Amendment, an uneasy and unsettled constitutional posture [that] could only further harm the operation of a free press") (internal quotation marks and alterations omitted); see also Blount v. Rizzi , 400 U.S. 410, 416-417, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (noting that prior restraints "require 'prompt judicial review' * * * to prevent the administrative decision of the censor from achieving an effect of finality").[10]
Given all of that, the Division's 2016 Letter comfortably fits the mold of cases *1284 in which we have held that the actions of subordinate agency officials qualify as final agency action. See Safari Club Int'l v. Jewell , 842 F.3d 1280 (D.C. Cir. 2016) (Fish and Wildlife press release adopting position of Division of Scientific Authority constitutes final agency action); Rhea Lana, Inc. , 824 F.3d at 1025 (letter from subordinate official informing company of agency's longstanding interpretation of the Fair Labor Standards Act is final agency action); Appalachian Power Co. , 208 F.3d at 1021-1022 (guidance drafted by subordinate EPA officials constitutes final agency action); Her Majesty the Queen , 912 F.2d at 1531 (letter of assistant EPA official-with explicit caveat that it contained only a personal opinion-constitutes final agency action); Natural Res. Def. Council, Inc. v. Thomas , 845 F.2d 1088, 1093-1094 (D.C. Cir. 1988) (memorandum drafted by subordinate EPA official constitutes final agency action); Ciba-Geigy Corp. , 801 F.2d at 435 (letters issued by director of pesticide programs constitute final agency action).
* * * * *
As the opinion for the court notes, agency advice that is genuinely advisory can play an important role in allowing the regulators and regulated to communicate effectively and work together in coordinating voluntary compliance measures and improving the effectiveness of regulatory programs.
But "such a 'count your blessings' argument is not an adequate rejoinder to the assertion of a right to judicial review[.]" Hawkes Co. , 136 S.Ct. at 1816. If agencies want to give advice, they should speak in advisory terms, allow for internal review, or not attach substantial consequences to noncompliance with what is supposed to be mere advice.
To be sure, allowing judicial review in this case might increase the fact-finding burden on agencies issuing advisory opinions, but that will only be true for a certain subset of decisions-those with unambiguous pronouncements of a legal position, announced compliance dates, and substantial legal consequences for failure to fall in line. And those seem to be precisely the cases in which the law should force agencies to take a harder look, to substantiate their judgments, and to submit their decisions to judicial review. If the agency does not yet have all the facts or is not yet committed to its position as a matter of statutory policy, perhaps it should finish the job before telling an industry to shutter its operations.
At bottom, finality is about agency accountability for the decisions it makes and the consequences it unleashes. The Division's 2016 Letter, after all, is not about just adjusting or modifying business behavior to comport with regulatory standards. Rather, the Letter announces that plain regulatory language broadly condemns as illegal an entire business model. The Letter then assigns a date certain by which businesses are expected to comply by largely ceasing their operations, laying off employees, and writing off significant financial investments. Failure to toe the Division's line will expose the soundboard industry to potentially severe penalties, with no right first to administrative appeal or review. The Division Letter leaves the soundboard industry whipsawed between abandoning its business and facing potentially ruinous enforcement actions and penalties. In these circumstances, the benefits of informal and collaborative interchange between the regulator and the regulated have evaporated. And the agency should not be able to transmogrify the mantle of "staff advice" into both a sharp regulatory sword and a shield from judicial review.
No doubt a technology used for telemarketing is hardly a sympathetic poster *1285 child for a dissenting opinion. But the pride of our legal system is its evenhandedness and fairness to all who come before it. Plus the issue here is not whether the Commission can regulate the soundboard industry or telemarketing. It is only whether the Commission must own up to the regulatory actions it has set in motion, and whether those who are told to close up shop and discharge their employees are entitled first to a day in court. In my view, if the law requires us to treat the 2016 Division Letter and its business-ending consequences as just some informal, take-it-or-leave-it staff suggestion, then the law is being stingy with reality. I respectfully dissent.

Available at https://www.ftc.gov/system/files/documents/advisory_opinions/letter-lois-greisman-associate-director-division-marketing-practices-michael-bills/161110staffopsoundboarding.pdf.

According to the regulations, a Commission opinion is warranted only when the "matter involves a substantial or novel question of fact or law and there is no clear Commission or court precedent," or the "subject matter of the request and consequent publication of Commission advice is of significant public interest." 16 C.F.R. § 1.1(a).

In this case, an industry member requested staff advice following the adoption of the Telemarketing Sales Rule, 16 C.F.R. § 310, and the Commission directed the staff to issue an opinion. Staff initially advised in 2009 that the Rule would not apply to soundboard technology. Letter from Lois C. Greisman, Assoc. Dir., Div. Mktg. Practices, to Michael Bills, Chief Exec. Officer, Call Assistant (Sept. 11, 2009), https://www.ftc.gov/sites/default/files/documents/advisory_opinions/opinion-09-1/opinion0901_1.pdf ("2009 Division Letter"). Staff revisited and "revoked" its advice in the 2016 Letter based on new fact findings about the nature of soundboard technology when used for telemarketing. See 2016 Division Letter, supra , at 3.

One Commission letter addressed a matter in the first instance. See Letter from Donald S. Clark, Sec'y, Fed. Trade Comm'n , to Rozanne M. Anderson, ACA Int'l & Andrew M. Beato, Stein, Mitchell & Mezines, LLP (June 23, 2009), https://www.ftc.gov/ system/ files/documents/advisory_opinions/federal-trade-commission-advisory-opinion-clarifying-intersection-fair-debt-collection-practices-act/p064803facta-adop-1.pdf. The other came almost thirteen years after an advisory opinion by agency staff had issued. See Letter from Donald S. Clark, Sec'y, Fed. Trade Comm'n , to Jonathan Sheldon & Carolyn Carter, Nat'l Consumer Law Ctr. (May 3, 2012) (continuing the longstanding position adopted by staff), https://www.ftc.gov/system/files/documents/advisory_opinions/16c.f.r.part-433-federal-trade-commission-trade-regulation-rule-concerning-preservation-consumers-claims/120510advisoryopinionholderrule.pdf.

See also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances.").

The court responds that Soundboard lacked any basis for reasonable reliance here because the facts Call Assistant provided to the agency in 2009 did not reflect reality. That puts the cart ahead of the horse since judicial review is where parties can contest the accuracy and substantiality of agency factual determinations. 5 U.S.C. § 706 (providing for judicial review of final agency action "unsupported by substantial evidence"). Anyhow, that same point would be just as true if the Commission were to issue an indisputably final Commission opinion. See 16 C.F.R. § 1.3(b) ("The Commission will not proceed against the requesting party with respect to any action taken in good faith reliance upon the Commission's advice under this section, where all the relevant facts were fully, completely, and accurately presented to the Commission[.]"). What matters to finality is that staff letters, even if not formally granted safe harbor protection, functionally serve the same purpose in that, by dint of the knowledge requirement, they will generally preclude imposition of penalties where regulated entities have reasonably relied on the agency's advice.

See 16 C.F.R. § 0.16 (The Bureau "investigat[es] alleged law violations, conducts compliance investigations and initiates proceedings for civil penalties to assure compliance with final Commission orders[.]"); id. § 2.1 (delegating authority to the Bureau to initiate investigations); id. § 2.5 (noting that delegated agents conduct investigations).

See Fed. Trade Comm'n , Advisory Opinions , https://www.ftc.gov/policy/advisory-opinions (last visited April 17, 2018).

At oral argument, counsel for the Commission indicated that each individual phone call "would be a violation," which would accumulate even more rapidly into crushing financial penalties. Oral Arg. Tr. 24. Like the Supreme Court in Sackett , this court need not definitively resolve the amount of penalties that the law might ultimately permit in these circumstances. 132 U.S. at 126 & n.3, 10 S.Ct. 39 (assuming without deciding that government is correct about liability for penalties). What matters to finality analysis is the "Government's current litigating position," grounded in statutory text, that failure to comply with the 2016 Division Letter could provide a legal basis for substantial civil penalties, id . at 126, 10 S.Ct. 39. That risk is a specific and concrete legal consequence that flows from the challenged agency action. See id. And because the Division Letter spawns such legal exposure, the mere possibility that prosecutorial discretion later down the road could reduce the amount of penalties says nothing about the finality of agency action now .

The opinion for the court cabins consideration of any potential chilling effect to the ripeness inquiry alone. Op. at 1272-73 n.5. But factors relevant to ripeness often bear on finality as well. See Ciba-Geigy , 801 F.2d at 435 (considering finality as a component of ripeness).